UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------------X
                                                          :
SPIN MASTER LTD. and SPIN MASTER, INC.,                   :
                                                          :
                                                          :
                                    Plaintiffs,           :          18-cv-1774 (LJL)
                     -v-                                  :
                                                          :          OPINION & ORDER
158, et al,                                               :
                                                          :
                                    Defendants.           :
                                                          :
------------------------------------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__5/28/2020__

LEWIS J. LIMAN, United States District Judge:

Plaintiffs Spin Master Ltd. and Spin Master, Inc. (collectively, "Plaintiffs" or "Spin

Master") move for a default judgment pursuant to Fed. R. Civ. P. 55(b)(2) and for a permanent

injunction pursuant to Fed. R. Civ. P. 65. *See* Dkt. Nos. 80-83. The Court held a conference on

April 8, 2020 at which no defendants appeared.

For the following reasons, the motion is granted in part and denied in part.

## BACKGROUND

Plaintiffs are two entities that are part of a larger, multinational toy and entertainment

company started in 1994 that designs and sells innovative children's lifestyle products and toys

("Spin Master Products") under their own brands and under their licensed properties. *See* Dkt.

No. 6 ("Compl.") ¶ 7. Plaintiff Spin Master Ltd. is a limited liability company organized in

Canada with its principal place of business in Canada. *Id.* ¶ 4. Plaintiff Spin Master, Inc. is a

Delaware corporation with its principal place of business in California and a registered office in

New York; it is also Spin Master Ltd.'s wholly-owned subsidiary and exclusive United States

licensee. *Id.* at 2; *see id.* ¶ 5. Plaintiffs sell their Spin Master Products throughout the United

States and the world through major retailers, quality toy stores, department stores, and online

marketplaces, as well as through Plaintiffs' own website and websites dedicated to individual Spin Master Products. *Id.* ¶¶ 8-9.

This action concerns what is alleged to be one of Spin Master's most recent and successful products, Bunchems. Bunchems are colorful, quarter-sized plastic balls that can be connected and squished together to form different shapes, characters, and other creations ("Bunchem Products"). *Id.* ¶ 10. The Bunchem Products come with accessories to give each creation a unique look and can be recreated over and over again by pulling them apart and putting them together to form different and new creations. *Id.* The Bunchem Products retail from $5.99 to $29.99 depending on the size and features of the pack. *Id.* ¶ 14.

Spin Master is the owner of a trademark for the mark "BUNCHEMS" for a variety of goods ("Bunchems Marks"). *Id.* ¶ 16. It also owns both registered and unregistered copyrights in and related to the Bunchems Products ("Bunchems Works"). *Id.* ¶¶ 18-19. Plaintiffs have promoted the Bunchem Products through their website, nationwide television advertising campaigns, print and internet-based advertising and publicity, placement of the Bunchem Products at dozens of authorized major retail outlets, and participation in trade shows. *Id.* ¶ 21.

Defendants are 100 individuals and/or businesses who, using accounts with online marketplace platforms ("User Accounts"), operate one or more commercial businesses to manufacture, import, export, advertise, market, distribute, offer for sale and/or otherwise deal in products ("Merchant Storefronts") in wholesale quantities at significantly below-market prices to consumers worldwide, including those in the United States and specifically New York (collectively, "Defendants"). *Id.* ¶¶ 2(a)-(b), 31. One of these online marketplaces and e-commerce platforms is Wish.com (hereinafter, "Wish"). *Id.* ¶¶ 26, 30. Wish allows manufacturers and other third-party merchants, like Defendants, to advertise, distribute, offer for

sale, sell, and ship retail products originating primarily from China, among other locations, directly to consumers worldwide, including those that reside in the United States.  *Id.* ¶ 26.  Wish is owned by ContextLogic, Inc.  *See id.* ¶ 6; Dkt. No. 19 ¶ 3.

Wish claims a base of over 300 million users and has generated billions in sales worldwide.  Compl. ¶ 27.  Sales to the United States make up a significant percentage of business done on Wish.  For example, online sales account for 8.6% of all retail transactions in the United States and nearly 8% of online shopping done by teenagers was performed using Wish, which is second only to Amazon.com.  *Id.*  On "Cyber Monday" of 2017, Wish accounted for 6.2% of teenager spending.  *Id.*  Plaintiffs allege that Defendants conduct business in the United States and other countries by means of their User Accounts and on their Merchant Storefronts on Wish, as well as potentially yet undiscovered additional online marketplace platforms.  *Id.* ¶ 30.

The Complaint broadly accuses each Defendant of violations in connection with selling or offering for sale "Counterfeit Products": trademark counterfeiting, trademark infringement, and false designation of origin, passing off and unfair competition under the Lanham Act, 15 U.S.C. §§ 1114, 1116(d), 1117(b)-(c), 1125(a); copyright infringement under the Copyright Act, 17 U.S.C. § 501(a); violations of New York General Business Law §§ 349, 350; unfair competition under New York common law; and unjust enrichment under New York common law.

Counterfeit Products are defined broadly to be products bearing or used in connection with the Bunchems Mark and/or Bunchems Works, and/or products in packaging and/or containing labels and/or hang tags bearing the Bunchems Mark and/or Bunchems Works, and/or bearing or used in connection with marks and/or artwork that are confusingly or substantially

similar to the Bunchems Mark and/or Bunchems Works and/or products that are identical or confusingly or substantially similar to Bunchems Products. *Id.* ¶ 34. The Counterfeit Products are nearly indistinguishable from Spin Master's Bunchems Products, only with minor variations that no ordinary consumer would recognize. *Id.* ¶ 36.

Plaintiffs allege that through their Merchant Storefronts on Wish, Defendants offer for sale and/or sell Counterfeit Products and target and ship such products to customers located in the United States, including New York. *Id.* ¶ 31. Plaintiffs further allege that Defendants accept payments for Counterfeit Products in United States Dollars through Wish's own payment processing system or through accounts with the payment processing agency PayPal, Inc. *Id.* ¶ 38. Defendants have never been authorized to sell or copy Bunchems Products or to use the Bunchems Works or Bunchems Marks. *Id.* ¶ 35.

The Complaint provides helpful illustrations of three examples of Counterfeit Products offered for sale by three Defendants. *Id.* ¶¶ 39-41. The Bunchems Products in those particular examples typically sell for $19.99 but are being offered by those Defendants for half of that price. *Id.* The Complaint also attaches as Exhibit D, and incorporates by reference, the findings of a company that provides trademark infringement research services, New Alchemy Limited ("NAL"). Exhibit D contains listings for and/or checkout pages of Counterfeit Products for each of the Defendants, demonstrating that they offer for sale Counterfeit Products. *Id.* ¶ 38. Plaintiffs specifically retained NAL to investigate and research manufacturers, wholesalers, retailers and/or other merchants offering for sale and/or selling Counterfeit Products on Wish. *Id.* ¶ 33. NAL identified the Defendants in this action and verified that each Defendant offered for sale and can ship Counterfeit Products to New York. *Id.* ¶¶ 37-38; Dkt. No. 19 ¶ 18.

## PROCEDURAL HISTORY

Plaintiffs initiated this action by complaint and order to show cause on February 27, 2018.  Dkt. No. 81 ("Scully Aff." or "Scully Affidavit") ¶ 9.  Subsequently, the Court, per the Honorable Paul A. Engelmayer, entered the temporary restraining order ("TRO") on February 28, 2018.  *Id.* ¶ 11.  The TRO specifically authorized service by electronic means.  *Id.* ¶ 13.  Pursuant to the TRO, Plaintiffs served Defendants on March 9 and March 12, 2018 with the Summons, Complaint, TRO and all papers filed in support of Plaintiffs' application.  *Id.* ¶ 14.  On March 13, 2018, the Court held a show cause hearing, at which no Defendants appeared, and thereafter entered an order against all Defendants, mirroring the terms of the TRO and extending through the pendency of the action.  *Id.* ¶¶ 16-17.

Between April 25, 2018 and March 5, 2020, Plaintiffs moved for voluntary dismissal of forty-five (45) Defendants pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i) ("Dismissed Defendants").[1]

On February 4, 2020, this case was reassigned to the undersigned.

On February 6, 2020, Plaintiffs filed an application for a Clerk's Certificate of Default against the remaining fifty-five (55) Defendants in the action ("Defaulting Defendants").[2]  *See*

---

[1] Dismissed Defendants include 20170307, 371656016, baileyshanda, Beauty Look, Beyond NO.1 Trade Store, Blue harbor, caiqing trade, charming_family, crazt fast stoy, e38, erkino, Fashion International Trade LTD, Fashionjewery2017, fashionstar999, Good princess, goodsbyk, G-star Family, High Quality Toys Store, Kuala Lips, Li Ka-shing, longing, luckluck688, Lucky Star 66, lulucat, mama's memory, manymanygoods, MIAO DUN, mishideshitou, nychalakh, October Autumn, Olden, ourlove-007, Pop_Fashion, Qiantoto eCO, shopping centers, Social Shopping, UniqueArt, wangting0089, weilistore, Welcomebiubiu, Winged Victory Ecommerce, wxy20170113, xghzhong, ZLQ-VN, and zou3133.  Defendants caiqing trade and High Quality Toys Store were dismissed on March 5, 2020, after Plaintiffs filed an application for default, but they were not included as Defaulting Defendants in Plaintiffs' papers.  *See* Dkt. No. 84.
[2] Defaulting Defendants include 158, 18929434653, Amarantines, Beautiful angel trading company, Big Merchant, Black hao shop, chengfengmaoyi, Deap date yang, Ding Sheng Electronic Commerce, Dreamslink Firm, duozifengcai123, Fashion 3C International Trade Co., Ltd, Fashion China Trade Co., Ltd, fashion hunter, fashiondidi666, finesellings, flastbuy, freely shopping, FUDAN, FunShoppingHome, GFBC, hagnzhou jiye, Heng bo sound, hnjoing, Hui Fang Top-rated Seller-01 Store, jiangxinanchang527, jin peng DQ, jingxiaopu, Kejingmeimeida,

Dkt. Nos. 76, 78.  On February 20, 2020, the Court entered an order directing Plaintiffs to move for default judgment against the Defaulting Defendants by no later than March 5, 2020.  *See* Dkt. No. 79.  Plaintiffs filed the motion and supporting papers on March 5, 2020.  *See* Dkt. Nos. 80-83.  The Court scheduled a hearing for April 8, 2020.  *See* Dkt. No. 85.

On its initial review of the motion for a default judgment, the Court identified a number of issues with respect to the motion (discussed below) and, accordingly, on April 7, 2020, it issued an order identifying 14 sets of questions that counsel for Plaintiffs should be prepared to address regarding the motion for default judgment and permanent injunction.  Dkt. No. 87.  On April 8, 2020, the Court heard oral argument from counsel for Plaintiffs.  No Defendants appeared.  On April 17, 2020, Plaintiffs submitted a supplemental memorandum in support of their motion for a default judgment and permanent injunction.  *See* Dkt. No. 88.

## DISCUSSION

### A.    Personal Jurisdiction

The Court previously determined there was personal jurisdiction at the TRO stage. Nonetheless, before this Court grants a motion for default judgment and imposes permanent injunctive relief, it is appropriate for the Court to assure itself that it has personal jurisdiction over those defendants it purports to bind indefinitely.  *See Sinoying Logistics Pte Ltd. v. Yi Da Xin Trading Corp.*, 619 F.3d 207, 213 (2d Cir. 2010).  The exercise here is unattractive but necessary.  *See In re Rationis Enters., Inc. of Panama*, 261 F.3d 264, 270 (2d Cir. 2001) ("A court may not grant a final, or even an interlocutory, injunction over a party over whom it does

---

laodie Technology Co., Ltd, linda2011store, litongtong8991, liuqianliuyue, Long long Market, mppy qqq y0y0 101, oobilu, ouhuadan, ouyansainan, Rainbow Star, Self Montessori, Seven Ting shop, shenzhenshijingchengyouxiangongsi, shizhushuop, sunhappybuy, tiantianfashion, tommy, weibin's shop, xiao xiong toy store, xiaozhenhong, yangdongxia, ye1234, yunbosi, yunhua store, ywyoyo, and zhejiang bigbighouse trade.  *See* Dkt. No. 83 at i-ii.

not have personal jurisdiction.").[3]  If Plaintiffs' allegations are to be credited, as they must be, Defaulting Defendants are unrepentant counterfeiters who are permitted to operate virtually anonymously through Wish and other online marketplaces.  By their absence in this action, they have frustrated Plaintiffs' ability to obtain information from them about where they do business.  Yet, before the Court may enjoin even the most flagrant wrongdoers, it must have personal jurisdiction over them, and the Plaintiffs have the burden of pleading such personal jurisdiction.  *See In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (courts construe all pleadings and affidavits in the light most favorable to the plaintiff but "will not draw argumentative inferences in the plaintiff's favor" or "accept as true a legal conclusion couched as a factual allegation") (internal quotation marks and citations omitted).  In the absence of a proper pleading of personal jurisdiction, Plaintiffs had no right to demand an answer to their Complaint.

As Plaintiffs proceed under a federal statute without its own jurisdictional provision, this Court applies the personal jurisdiction rules of the forum state, New York, provided they are

---

[3] Several circuits require the district court to assure itself that it has personal jurisdiction before entering a default judgment.  *See, e.g.*, *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) ("[A] court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant."); *System Pipe & Supply, Inc. v. M/V Viktor Kurnatovskiy*, 242 F.3d 322, 324 (5th Cir. 2001) ("It should therefore be apparent that a district court has the duty to assure that it has the power to enter a valid default judgment."); *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999) ("To avoid entering a default judgment that can later be successfully attacked as void, a court should determine whether it has the power, *i.e.*, the jurisdiction, to enter the judgment in the first place."); *Williams v. Life Sav. & Loan*, 802 F.2d 1200, 1203 (10th Cir. 1986) ("[W]hen entry of a default judgment is sought against a party who has failed to plead or otherwise defend, the district court has an affirmative duty to look into its jurisdiction both over the subject matter and the parties. In reviewing its personal jurisdiction, the court does not assert a personal defense of the parties; rather, the court exercises its responsibility to determine that it has the power to enter the default judgment.").

While the Second Circuit has left open the question of whether such inquiry is required, it has also made clear that it is appropriate.  *See Sinoying*, 619 F.3d at 213 ("[W]e agree with our sister circuits that before a court grants a motion for default judgment, it may first assure itself that it has personal jurisdiction over the defendant.").

consistent with Due Process.  *See Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 35 (2d

Cir. 2010).  Thus, the Court engages in a "two-step analysis" to determine personal jurisdiction

over a non-domiciliary in a trademark or copyright case.  First, the Court applies the forum

state's long-arm statute.  *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir.

2010).  "If the long-arm statute permits personal jurisdiction, the second step is to analyze

whether personal jurisdiction comports with the Due Process Clause of the United States

Constitution."  *Id.* at 164; *see also Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 168 (2d Cir.

2013) (same).

> ### 1.      N.Y. C.P.L.R. § 302(a)(1)

Plaintiffs rely on N.Y. C.P.L.R. § 302(a)(1) to support personal jurisdiction over the

Defaulting Defendants, which they allege conduct business in New York by means of shipping

products to New York through their User Accounts and Merchant Storefronts on Wish.  Compl.

¶¶ 30-31.  Section 302(a)(1) states that "a court may exercise personal jurisdiction over any

non-domiciliary . . . who in person or through an agent . . . transacts any business within the state

or contracts anywhere to supply goods or services in the state."  Plaintiffs must meet two

requirements to establish personal jurisdiction under Section 302(a)(1): "(1) The defendant must

have transacted business within the state; and (2) the claim asserted must arise from that business

activity."  *Eades v. Kennedy PC Law Offices*, 799 F.3d 161, 168 (2d Cir. 2015) (quoting *Licci*,

732 F.3d at 168).  Because Section 302(a)(1) is a "single act statute," "the 'single act' of selling

counterfeit goods into New York satisfies the long-arm statute under section 302(a)(1)."  *Chloe*,

616 F.3d at 170.

Under the first prong, a non-domiciliary defendant need not be physically present in New

York to "transact business," so long as the defendant has engaged in "purposeful activity," for

example, "some act by which the defendant purposefully avails itself of the privilege of

conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246-47 (2d Cir. 2007) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)); *see also Chloe*, 616 F.3d at 170.

Plaintiffs allege that all of the business activity by Defaulting Defendants occurred through the internet, specifically through the User Accounts and Merchant Storefronts on Wish and possibly other online platforms.  When a defendant is alleged to have "transacted business" by means of a website, courts apply a "sliding scale" test to determine whether operation of a website accessible in New York could be said to constitute purposeful availment and thus the transaction of business in New York.  The more "interactive" the website, such that it solicits information from potential buyers in New York in order for the defendant to sell them products in New York, the more likely a court is to find that the defendant is "transacting business" through the website in New York and is subject to the court's jurisdiction.  *See EnviroCare Techs., LLC v. Simanovsky*, 2012 WL 2001443, at *3 (E.D.N.Y. June 4, 2012); *see also Chloe*, 616 F.3d at 170 (holding that operation of highly interactive website plus shipment of one counterfeit product and over 50 other products into New York was sufficient for personal jurisdiction); *Alpha Int'l, Inc. v. T-Reproductions, Inc.*, 2003 WL 21511957, at *3 (S.D.N.Y. July 1, 2003) ("Websites that permit information exchange between the defendant and viewers are deemed 'interactive.'").

It is, of course, not sufficient that the defendant conducts business through an interactive third-party website; the question is whether the defendant used the website to reach into the forum in some meaningful way.  *See Savage Universal Corp. v. Grazier Constr., Inc.*, 2004 WL 1824102, at *8-9 (S.D.N.Y. Aug. 13, 2004) (Lynch, J.).  A defendant who uses the third-party website for sale of an item to the highest bidder cannot be said to be soliciting a particular forum;

in that case, a third party, "and not the user, controls the interactivity and marketing efforts of the website," and the interaction with New York by the defendant cannot be said to be purposeful. *EnviroCare Techs.*, 2012 WL 2001443, at *3 ("The 'usual online auction process' where an unsophisticated seller uses eBay's template to post an item for sale and sells and ships the item to the highest bidder typically 'does not rise to the level of purposeful conduct required to assert specific jurisdiction.'") (citation omitted); *see also LifeGuard Licensing Corp. v. Ann Arbor T-Shirt Co., LLC*, 2016 WL 3748480, at *3 (S.D.N.Y. July 8, 2016) ("[A]ssuming no additional contacts with the forum state," jurisdiction is "improper" as to "occasional sellers who use an internet service once to sell goods to the highest bidder who happens to be in the forum state"). In contrast, a defendant who uses the third-party website "as a means for establishing regular business with a remote forum" and conducts business within that forum may be found to purposefully avail itself of that forum. *EnviroCare Techs.*, 2012 WL 2001443, at *3 (citing cases); *see also LifeGuard Licensing*, 2016 WL 3748480, at *3.

Before filing the Complaint, and as part of their investigation, Plaintiffs purchased Counterfeit Products on Wish from six of the Defaulting Defendants and three of the Dismissed Defendants—and those defendants shipped the products to New York. Dkt. No. 19 ¶¶ 23-24; *see id.*, Exs. B, C.[4]  "A single sale may be sufficient provided that the defendant's activities were purposeful and there was a substantial relationship between the transaction and the claim asserted." *WowWee Grp. Ltd. v. Meirly*, 2019 WL 1375470, at *3 (S.D.N.Y. Mar. 27, 2019); *see Chloe*, 616 F.3d at 166.  That is so even when the sale is made to a representative of the

---

[4] Plaintiffs purchased Counterfeit Products from Defaulting Defendants ywyoyo, Self Montessori, freely shopping, tiantianfashion, duozifengcai123, and jiangxinanchang527.  *See* Dkt. No. 19, Exs. B-C.  Plaintiffs also purchased Counterfeit Products from Dismissed Defendants MIAO DUN, High Quality Toys Store, and Welcomebiubiu.  *Id.*

plaintiff's law firm. *See Chloe*, 616 F.3d at 162-63, 170.  By shipping the Counterfeit Products to New York, those six Defaulting Defendants "purposefully availed themselves of the privileges of conducting activities in New York." *WowWee Grp.*, 2019 WL 1375470, at *3 (34 defaulting defendants sold and shipped counterfeit items to New York through Wish); *see also Brady v. Anker Innovations Ltd.*, 2020 WL 158760, at *5 (S.D.N.Y. Jan. 13, 2020) (at least one sale to New York through Amazon); *EnviroCare Techs.*, 2012 WL 2001443, at *4 (same).  Further, the exhibits submitted by Plaintiffs demonstrate that these six Defaulting Defendants did not sell their products to the highest bidder such that the forum of New York was happenstance, but rather offered for sale and did sell and ship to New York.  *See WowWee Grp.*, 2019 WL 1375470, at *3 (sales to New York through Amazon established regular business with New York); *Brady*, 2020 WL 158760, at *5 (defendant used its storefront on Amazon to expand its nationwide reach, including through sales to New York); *EnviroCare Techs.*, 2012 WL 2001443, at *3 (at least one sale to New York through Amazon and noting that the use of the internet to expand a seller's market "literally to the world" requires a merchant to accept "the concomitant legal responsibilities that such an expanded market may bring with it").

The second prong of Section 302(a)(1) requires an "articulable nexus or substantial relationship between the business transaction and the claim asserted," but a causal relationship is not required.  *Gucci Am., Inc. v. Weixing Li*, 135 F. Supp. 3d 87, 93 (S.D.N.Y. 2015) (internal citations and quotations omitted).  The Lanham Act prevents the "sale" or "the offering of sale" of infringed trademarks.  15 U.S.C. § 1114(1)(a)-(b).  Here, there is no question that the business transaction (*i.e.*, the offer and/or sale of the Counterfeit Products) in New York has a substantial relationship with the claim asserted in this action against the six Defaulting Defendants (*i.e.*,

Defaulting Defendants' offers or sales of products that infringe upon trademarks or contain counterfeited trademarks).  This second prong is easily met here.

Plaintiffs, however, do not allege facts establishing that the remaining 49 Defaulting Defendants sold and shipped Counterfeit Products to New York.  Personal jurisdiction is an individualized exercise; in the absence of allegations of agency or conspiracy (not present here), Plaintiffs must show personal jurisdiction over each defendant against which they seek relief. *See Cenage Learning, Inc. v. Buckeye Books*, 531 F. Supp. 2d 596, 599 (S.D.N.Y. 2008) ("Lumping all the 'defendants' together for purposes of alleging connections to New York is, however, patently insufficient."); *see also In re Terrorist Attacks*, 714 F.3d at 675-80 (analyzing personal jurisdiction for each of the 37 defendants); *Astor Chocolate Corp. v. Elite Gold Ltd.*, 2020 WL 2130680, at *8-12 (S.D.N.Y. May 5, 2020) (analyzing personal jurisdiction for each defendant and ordering jurisdictional discovery).  Exhibit D to the Complaint, which contains checkout pages, shows that the Defaulting Defendants can ship the Counterfeit Products to New York, but these pages do not reflect that any of the remaining 49 Defaulting Defendants necessarily did ship Counterfeit Products to New York.  Exhibit F to the Scully Affidavit contains a report provided by ContextLogic to Plaintiffs that identifies Defaulting Defendants' sales of Counterfeit Products through Wish, but it does not reflect that those sales were of Counterfeit Products sold or shipped to New York.

Merely offering a product outside New York for sale in New York is not enough to constitute purposeful availment when no sale actually takes place in New York or to a New York resident.  Without allegations that there was purposeful availment of New York, such as through actual sales to New York or even perhaps active solicitation of the New York market, it cannot be said that a defendant "transacted business" under N.Y. C.P.L.R. § 302(a)(1) so as to satisfy

personal jurisdiction.  Indeed, "[i]t stretches the meaning of 'transacting business' to subject defendants to personal jurisdiction in any state merely for operating a website, however commercial in nature, that is capable of reaching customers in that state, without some evidence or allegation that commercial activity in that state actually occurred."  *Savage Universal Corp*, 2004 WL 1824102, at *9; *see also Alibaba Grp. Holding Ltd. v. Alibabacoin Foundation*, 2018 WL 2022626, at *4 (S.D.N.Y. Apr. 30, 2018) (no evidence that a single sale of Alibabacoin occurred in New York or that the majority of visitors to the site were based in New York so as to establish a reasonable probability that at least one New York sale had occurred).

### 2.    N.Y. C.P.L.R. § 302(a)(3)

As an alternative, Plaintiff asserts personal jurisdiction under N.Y. C.P.L.R. § 302(a)(3). To establish jurisdiction under N.Y. C.P.L.R. § 302(a)(3), Plaintiff must allege that "(1) the defendant committed a tortious act outside New York; (2) the cause of action arose from that act; (3) the tortious act caused an injury to a person or property in New York; (4) the defendant expected or should reasonably have expected the act to have consequences in New York; and (5) the defendant derived substantial revenue from interstate or international commerce."  *Penguin Grp. (USA) Inc. v. Am. Buddha*, 16 N.Y.3d 295, 302 (2011).  Because the Court has determined that personal jurisdiction is properly pled with respect to six Defaulting Defendants pursuant to Section 302(a)(1), it analyzes Section 302(a)(3) for only the remaining 49 Defaulting Defendants.

Plaintiffs have adequately alleged the first two elements: that the remaining 49 Defaulting Defendants have committed the tortious acts of trademark and copyright violations outside New York by creating and offering for sale Counterfeit Products through the internet, and that the causes of action in this case arise from those acts.  But Plaintiffs have not adequately alleged the

13

third and fourth elements for these Defaulting Defendants, namely, injury to person or property in New York.

Under Section 302(a)(3), there are at least two potential ways in which a plaintiff can establish personal jurisdiction over a defendant in a trademark or copyright case in New York. First, under some limited circumstances, a court will find that the situs of injury is New York, and the third element of Section 302(a)(3) is established, when the principal place of business of the injured plaintiff is in New York.  This was the case in *Penguin Group* where the New York owner of copyrights to four books sued the operator of a website who infringed those copyrights by uploading complete copies of the owner's works to the internet in Oregon and Arizona.  16 N.Y.3d at 300-01.  "[T]he primary aim of the infringer [was] to make the works available to anyone with access to an Internet connection, including computer users in New York."  *Id.* at 306.  Thus, "[t]he crux of Penguin's copyright infringement claim [was] . . . the instantaneous availability of those copyrighted works on [defendant's] [w]eb sites for anyone, in New York or elsewhere, with an internet connection to read and download the books free of charge," *id.* at 304-05, and the "locus of injury" could not be "clearly circumscribed" but rather was "dispersed throughout the country and perhaps the world," *id.* at 305.  In that circumstance, the New York Court of Appeals determined that "the place of uploading [was] inconsequential and it [was] difficult, if not impossible, to correlate lost sales to a particular geographic area."  *Id.*  At least in those limited circumstances, where there was "no singular location" that could be identified as the place of lost sales, and where the copyright holder suffered injury to its "unique bundle of rights," including "diminishment of the incentive to publish or write," the Court of Appeals held that the location of the injury was the principal place of business of the copyright owner and jurisdiction lay over the defendant in New York.  *Id.*; *see also Troma Entm't, Inc. v. Centennial*

*Pictures Inc.*, 729 F.3d 215, 220 (2d Cir. 2013) (describing the injury in *Penguin Group* as "virtually impossible to localize" and therefore, there was no one place where plaintiff lost business).

Plaintiffs do not assert personal jurisdiction on a *Penguin Group* theory, and for good reason. Passing on the question of whether *Penguin Group* would be available in a case where a website is used to market a physical product that is then delivered into a particular geographic area, Plaintiffs do not allege their principal place of business is in New York. *Penguin Group* is not an available theory.

Second, in "traditional commercial tort cases," the plaintiff's injury is deemed to take "place where its business is lost or threatened." *Penguin Grp.*, 16 N.Y.3d at 305 (in "traditional commercial tort cases . . . courts have generally linked the injury to the place where sales or customers are lost"); *see Troma Entm't*, 729 F.3d at 220 (discussing "'traditional commercial tort cases' in which 'the place where [the plaintiff's] business is lost or threatened' exerts a significant gravitational influence on the jurisdictional analysis"). That is the theory Plaintiffs argue. *See* Dkt. No. 12 at 20 (arguing that the injury occurs through lost sales and lost consumers in the states where sales of the Counterfeit Products occur). The problem with Plaintiffs' theory though, is that, as with the Section 302(a)(1) analysis, Plaintiffs have not adequately pled any lost sales or lost consumers in New York for the 49 Defaulting Defendants. *See Energy Brands Inc. v. Spiritual Brands, Inc.*, 571 F. Supp. 2d 458, 467 (S.D.N.Y. 2008) ("This element has long been interpreted to include 'harm to a business in the New York market through lost sales or lost customers.'") (quoting *Am. Network, Inc. v. Access Am./Connect Atlanta, Inc.*, 975 F. Supp. 494, 497 (S.D.N.Y. 1997)).  They have thus failed to meet the third element.

Plaintiffs have similarly failed to demonstrate that those 49 Defaulting Defendants "expected or should reasonably have expected the act to have consequences in New York" so as to meet the fourth element. *Penguin Grp.*, 16 N.Y.3d at 302. They have not alleged that the same Defaulting Defendants made sales to New York or otherwise targeted New York, such as through active advertising or marketing efforts, so that they could be said to have "purposefully availed [themselves] of the benefits of the laws of New York, to the extent that [t]he[y] would reasonably anticipate being haled into a New York court." *Energy Brands*, 571 F. Supp. 2d at 468. Foreseeability is not sufficient; instead, it "must be coupled with evidence of a purposeful New York affiliation, for example, a discernible effort to directly or indirectly serve the New York market." *Id.* (citation omitted). As a result, Plaintiffs have failed to adequately plead personal jurisdiction with respect to the 49 Defaulting Defendants under either provision of New York's long-arm statute.

### 3.    Constitutional Due Process

The Due Process Clause of the Constitution requires minimum contacts with the forum state such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Because N.Y. C.P.L.R. § 302 permits the exercise of personal jurisdiction in a narrower range of circumstance than the Due Process Clause, this Court's exercise of personal jurisdiction under Section 302(a)(1) for the six Defaulting Defendants with New York sales comports with constitutional due process. *See D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 105 (2d Cir. 2006) ("[T]he constitutional requirements of personal jurisdiction are satisfied because application of § 302(a) meets due process requirements."); *Energy Brands*, 571 F. Supp. 2d at 469 ("[T]he Due Process Clause permits the exercise of jurisdiction in a broader range of circumstances of N.Y. C.P.L.R.

§ 302, and a foreign defendant meeting the standards of § 302 will satisfy the due process standard.").

The Court therefore finds personal jurisdiction only over the six Defaulting Defendants, but not over the remaining 49 Defaulting Defendants.

## B.     Motion for Default Judgment

The Court proceeds to analyze the motion for a default judgment with respect to the six Defaulting Defendants over which it has personal jurisdiction.

### 1.     Legal Standard

Fed. R. Civ. P. 55 sets forth a two-step procedure to be followed for the entry of judgment against a party who fails to defend: the entry of a default, and the entry of a default judgment.  *New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005).

The first step, entry of a default, simply "formalizes a judicial recognition that a defendant has, through its failure to defend the action, admitted liability to the plaintiff."  *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 128 (2d Cir. 2011); *see* Fed. R. Civ. P. 55(a).  The second step, entry of a default judgment, "converts the defendant's admission of liability into a final judgment that terminates the litigation and awards the plaintiff any relief to which the court decides it is entitled, to the extent permitted" by the pleadings.  *Mickalis Pawn Shop*, 645 F.3d at 128; *see also* Fed. R. Civ. P. 54(b).  Whether entry of default judgment at the second step is appropriate depends upon whether the allegations against the defaulting party are well-pleaded.  *See Mickalis Pawn Shop*, 645 F.3d at 137.

It is important to remember that "[a] defendant is always free to ignore the judicial proceedings [and] risk a default judgment."  *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 706 (1982).  The consequence is an "admission of all well-pleaded allegations against the defaulting party."  *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*,

373 F.3d 241, 246 (2d Cir. 2004).  Thus, because a party in default does not admit conclusions of

law, "a district court need not agree that the alleged facts constitute a valid cause of action."

*Mickalis Pawn Shop*, 645 F.3d at 137.  The essence of Fed. R. Civ. P. 55 is that a plaintiff can

obtain from a default judgment relief equivalent to but not greater than that it would obtain in a

contested proceeding assuming it prevailed on all of its factual allegations.  *See Finkel v.*

*Romanowicz*, 577 F.3d 79, 85 (2d Cir. 2009); *see also Au Bon Pain Corp. v. Artect, Inc.*, 653

F.2d 61, 65 (2d Cir. 1981) ("[A] district court has discretion under Rule 55(b)(2) once a default

is determined to require proof of necessary facts and need not agree that the alleged facts

constitute a valid cause of action.").  Therefore, this Court is "required to determine whether the

plaintiff's allegations are sufficient to establish the defendant's liability as a matter of law."

*Finkel*, 577 F.3d at 84.

"The legal sufficiency of these claims is analyzed under the familiar plausibility standard

enunciated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009), aided by the additional step of drawing inferences in the non-

defaulting party's favor."  *WowWee Grp.*, 2019 WL 1375470, at *5.  "[A] plaintiff is not entitled

to a default judgment and any concomitant damages as a matter of right simply by virtue of a

defendant's procedural default."  *Gould v. Marconi Dev. Grp., LLC*, 2020 WL 2042332, at *2

(N.D.N.Y. Apr. 28, 2020) (citing *Erwin DeMarino Trucking Co. v. Jackson*, 838 F. Supp. 160,

162 (S.D.N.Y. 1993) (noting that courts must "supervise default judgments with extreme care to

avoid miscarriages of justice")).

### 2.      Liability

Plaintiffs seek default on their first and second causes of action, trademark counterfeiting

and infringement in violation of the Lanham Act, 15 U.S.C. §§ 1114, 1116(d), and 1117(b)-(c).

Scully Aff. ¶ 8 n.2.  The Lanham Act holds liable any person who, without the consent of the

registrant of a mark, uses in commerce any reproduction, counterfeit, copy, or colorable

imitation of a registered mark—or reproduces, counterfeits, copies, or colorable imitates a

registered mark and applies such to labels, signs, prints, packages, wrappers, receptacles, or

advertisements intended to be used—in connection with the sale, offering for sale, distribution,

or advertising of any goods or services on or in connection with which such use is likely to cause

confusion, or to cause mistake, or to deceive.  15 U.S.C. §§ 1114(1)(a)-(b).

 To prevail on trademark counterfeiting and infringement claims, a plaintiff must establish

that it has a valid mark entitled to protection and that the defendant's use of the mark is likely to

cause consumers confusion as to the origin or sponsorship of the defendant's goods.  *Virgin*

*Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003).  To establish the former, a plaintiff may

provide a certificate of registration with the U.S. Patent and Trademark Office for the mark as

*prima facie* evidence of its validity.  *Lane Capital Mgmt, Inc. v. Lane Capital Mgmt, Inc.*, 192

F.3d 337, 345 (2d Cir. 1999).  Plaintiff may establish the latter—likelihood of confusion—

through the eight factors set forth in *Polaroid v. Polarad Elecs. Corp*, 287 F.3d 492, 495 (2d Cir.

1961): the strength of plaintiff's mark, the degree of similarity between the two marks, the

proximity of the parties' areas of commerce, the likelihood that plaintiff will bridge the gap

separating their areas of activity, actual consumer confusion, whether defendant acted in bad

faith or was otherwise reprehensible in adopting the mark, the quality of defendant's product,

and the sophistication of the relevant consumer group.  *See also Guthrie Healthcare Sys. v.*

*ContextMedia, Inc.*, 826 F.3d, 27, 37 (2d Cir. 2016).  However, where counterfeit items are

involved, the court "need not undertake a factor-by-factor analysis under *Polaroid* because

counterfeits, by their very nature, cause confusion."  *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*,

286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003); *see also WowWee Grp.*, 2019 WL 1375470, at *7.

Plaintiffs have established both elements as to the six Defaulting Defendants.  First, Spin Master alleges it is the owner of U.S. Trademark Registration No. 4,980,743 for "BUNCHEMS" in a variety of goods that are currently in use in commerce in connection with the Bunchems Products, and it has attached a copy of the registration certificate for the Bunchems Marks as Exhibit B to the Complaint.  *See* Compl. ¶¶ 16-17.  Second, Plaintiffs have established that the marks on the Counterfeit Products are likely to cause confusion because they are demonstrably counterfeit.

The Lanham Act defines "counterfeit" as a "spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127.  There is no question that the "BUNCHEMS" logo used in the three examples of Counterfeit Products provided in the Complaint is "substantially indistinguishable" from the Bunchem Marks, if not entirely identical to the Bunchems Marks in design, shape, size, shading, and color.  Plaintiffs have also provided examples of Counterfeit Products sold by each Defaulting Defendant.  *See* Compl., Ex. D.  Each of the Defaulting Defendants offers for sale, or has sold, toys featuring packaging with the Bunchems Marks, or describing the product as a Bunchems Product.  The featured toys are substantially indistinguishable from Bunchems Products.  Taking Plaintiffs' allegations in their Complaint as true, the marks on the remaining Counterfeit Products sold by the Defaulting Defendants are "each virtually identical to one of Plaintiffs' products and incorporate copies or colorable imitations of marks on their product packaging."  *WowWee Grp.*, 2019 WL 1375470, at *7.  Accordingly, the Counterfeit Products, by their nature, are likely to cause confusion.  The Court finds that default judgment on Plaintiffs' trademark counterfeiting and infringement claims is warranted with respect to the six Defaulting Defendants.

Although Plaintiffs seek statutory damages solely under the Lanham Act, their proposed permanent injunction references the Bunchems Works and thus seeks to prohibit the Defaulting Defendants from future violations of the Copyright Act.  It is thus necessary to analyze the liability of the six Defaulting Defendants under the Copyright Act before imposing a permanent injunction upon them that would restrict them from violating the Copyright Act.

To prevail on a copyright infringement claim, a plaintiff must demonstrate: "(i) ownership of a valid copyright; and (ii) unauthorized copying of the copyrighted work." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003) (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).  A certificate of registration from the United States Register of Copyrights constitutes *prima facie* evidence of the valid ownership of a copyright.  *Id.*; *see* 17 U.S.C. § 410(c).  Plaintiffs have submitted such registration certificates for the Bunchems Works and thus have met this first element.  *See* Compl., Ex. C.

To satisfy the second element, a plaintiff must demonstrate that: (1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's [work]." *Yurman Design, Inc. v. PAJ Inc.*, 262 F.3d 101, 110 (2d Cir. 2001).  A plaintiff may demonstrate actual copying "either by direct or indirect evidence," but because "direct evidence of copying is seldom available, a plaintiff may establish copying circumstantially," *Jorgensen*, 351 F.3d at 51, such as with "proof that the defendants had access to the copyrighted work and similarities that are probative of copying between the works," *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 99 (2d Cir. 1999).

"Access may be established directly or inferred from the fact that a work was widely disseminated or that a party had a reasonable possibility of viewing the prior work." *Boisson v.*

*Banian, Ltd*, 273 F.3d 262, 270 (2d Cir. 2001).  Here, access can be inferred from the fact that

Plaintiffs sell the Bunchem Products throughout the United States and the world through their

website and third-party stores, and that the Bunchem Products have achieved popularity,

including by receiving awards.  *See supra* at 2; Compl. ¶¶ 11-12; *see also McGraw-Hill Glob.*

*Educ. Holdings, LLC v. Khan*, 323 F. Supp. 3d 488, 498 (S.D.N.Y. 2018) ("Access may be

inferred when the defendant has had a 'reasonable opportunity to view' plaintiff's work before

creating his own.") (quoting *Gaste v. Kaiserman*, 863 F2d 1061, 1067 (2d Cir. 1988)).

        Plaintiffs have also alleged "substantial similarity."  The test for substantial similarity

between two items is whether an "ordinary observer, unless he set out to detect the disparities,

would be disposed to overlook them, and regard their aesthetic appeal as the same."  *Hamil*, 193

F.3d at 100 (quoting *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir.

1960) (L. Hand, J.)).  A side-by-side comparison of Plaintiff's Bunchem Products and the

Counterfeit Products offered for sale by the Defaulting Defendants demonstrates that they are

virtually indistinguishable, if not completely identical.  *Compare* Compl., Ex. A (Bunchem

Products), *with* Compl., Ex. D (Counterfeit Products offered by each Defaulting Defendant); *see*

*also supra* at 20.  In comparing the works, the court "could only reach one inescapable

conclusion: the images are substantially similar because they are exact copies."  *Michael Grecco*

*Prods., Inc. v. Valuewalk, LLC*, 345 F. Supp. 3d 482, 502 (S.D.N.Y. 2018) (quoting *Jackson v.*

*Odenat*, 9 F. Supp. 3d 342, 352 (S.D.N.Y. 2014)).  "For the same reasons that the allegations in

[the] Complaint establish that the products at issue are counterfeits, Plaintiff[s] ha[ve] carried

[their] burden of showing actual copying and substantial similarity" and established liability on

their copyright infringement claim so as to warrant a default judgment.  *William Mark Corp. v.*

*1&CC*, 2019 WL 4195365, at *7 (S.D.N.Y. May 20, 2019), *report and recommendation adopted*, 2019 WL 4194536 (S.D.N.Y. Sept. 3, 2019).

### 3.    Statutory Damages

Plaintiffs seek statutory damages against the six Defaulting Defendants on their claims for trademark counterfeiting and infringement.  *See* Scully Aff. ¶ 8 n.2; Dkt. No. 82 at 10.  They ask for a total statutory damages award against all of the Defaulting Defendants of $12,250,000, *see* Scully Aff., Ex. F, or to the extent the Court disagrees with the tiered request, a total of $2,750,000 ($50,000 per Defaulting Defendant), *see* Dkt. No. 88 at 5.  For the six Defaulting Defendants, the tiered request results in a total statutory damages award of $3,300,000, or alternatively, a total of $300,000. [5]

Although a default judgment entered on well-pleaded allegations establishes a defendant's liability, it does not reach the issue of damages, and Plaintiffs "must therefore substantiate [their] claim for damages with evidence to prove the extent of those damages." *Hood v. Ascent Med. Corp.*, 2016 WL 1366920, at *15 (S.D.N.Y. Mar. 3, 2016), *report and recommendation adopted*, 2016 WL 3453656 (S.D.N.Y. June 20, 2016), *aff'd*, 691 F. App'x 8 (2d Cir. 2017).  Where a plaintiff seeks damages on the theory that each individual acting alone infringed a work, rather than joint and severally, a court must assess damages with respect to each individual defendant such that the rights of the Defaulting Defendants are not compromised by the virtue of their being joined in the same action.  *Cf. McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 232 (2d Cir. 2008) ("[W]hen [] recovery is used, as here, to mask the prevalence of individual issues, it is an impermissible affront to defendants' due process rights.").

---

[5] Plaintiffs ask for statutory damages in the following amounts: Self Montessori ($1,500,000), tiantianfashion ($1,000,000), freely shopping ($500,000), ywyoyo ($200,000), jiangxinanchang527 ($50,000), and duozifengcai123 ($50,000).  *See* Scully Aff., Ex. F.

The Lanham Act sets forth three types of damages that are available to a plaintiff injured by trademark counterfeiting: (1) actual damages; (2) statutory damages of "not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just"; or (3) if the court finds that the use of the counterfeit mark was willful, "not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just."  15 U.S.C. § 1117(a)-(c).   In comparison to statutory damages, actual damages permit a plaintiff to recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."  15 U.S.C. § 1117(a).  In assessing actual damages for a willful violation, courts are instructed to award the greater of three times the amount of the defendant's profits or the plaintiff's losses, unless the court finds extenuating circumstances.  15 U.S.C. § 1117(b).

Congress enacted the statutory damages remedy in trademark counterfeiting cases because evidence of a counterfeiter's profits is almost impossible to ascertain since "records are frequently nonexistent, inadequate, or deceptively kept."  *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 315 F Supp. 2d 511, 520 (S.D.N.Y. 2004); *see also Coach, Inc. v. Weng*, 2014 WL 2604032, at *16 (S.D.N.Y. June 9, 2014) ("Section 1117(c) of the Lanham Act was created to give victims of trademark infringement and unfair competition an avenue for recovering damages when a defendant hides, alters, or destroys business records.").  "To the extent possible, statutory damages 'should be woven out of the same bolt of cloth as actual damages.'"  *Gucci Am.*, 315 F. Supp. 2d at 520 (quoting 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* 14.04[E][1] at 14-69 (2003)).

In making a determination of appropriate statutory damages awards, courts typically consider the following factors: "(1) the expenses saved and the profits reaped by defendant;

(2) the revenues lost by plaintiff; (3) the value of the mark; (4) the scale of defendant's infringement; (5) whether defendant's conduct was innocent or willful; (6) whether defendant has cooperated in providing particular records from which to assess the value of the infringing material produced; and (7) the potential for discouraging the defendant and others." *Streamlight, Inc. v. Gindi*, 2019 WL 6733022, at *11-12 (E.D.N.Y. Oct. 1, 2019), *report and recommendation adopted*, 2019 WL 6726152 (E.D.N.Y. Dec. 11, 2019) (citing *Fitzgerald Publ'g Co., Inc. v. Baylor Publ'g Co.*, 807 F.2d 1110, 1117 (2d Cir. 1986)); *see also Gucci Am., Inc.*, 315 F. Supp. 2d at 520.[6]

The fact that Plaintiffs have joined many different defendants in a single complaint for the convenience of Plaintiffs and the Court does not relieve this Court of its responsibility to ensure that damages are assessed on an individualized basis such that defendants who reaped fewer profits or infringed on a smaller scale, for example, are not made to pay the same or greater damages than the large-scale profitable infringer.  Accordingly, the Court declines to enter Plaintiffs' requested amounts of tiered statutory damages, which roughly group defendants together based solely on wide ranges of sales of Counterfeit Products and without justification for the amounts requested.  That approach both undercompensates and overcompensates.  *See, e.g.*, Scully Aff., Ex. F (requesting $50,000 in damages from hagnzhou jiye with zero sales of Counterfeit Products and the same amount from Rainbow Star with 82 sales of Counterfeit Products); *id.* (requesting $750,000 in damages from nppy qqq y0y0 101 with 1,037 sales of Counterfeit Products and the same amount from 158 with 3,811 sales of Counterfeit Products).

---

[6] "In the absence of any guidelines for determining the appropriate award in a case involving willful trademark violations, courts often have looked for guidance to the better developed case law under the Copyright Act, 17 U.S.C. § 504(c), which permits an award of statutory damages for willful copyright infringement." *Louis Vuitton Malletier v. Carducci Leather Fashions, Inc.*, 648 F. Supp. 2d 501, 504 (S.D.N.Y. 2009).

Instead, while certain factors apply equally to each of the six Defaulting Defendants, the final determination is individualized.

The analysis of the first and second factors is identical for each of the six Defaulting Defendants. The full extent of the profits reaped and the revenue lost by the Plaintiffs as a result of the infringing activity of each Defaulting Defendant is unknown, in part as a result of the failure of each defendant to appear and in part because of Defaulting Defendants' ability to use Wish to operate anonymously without displaying their business names or contact information. The effect of the default is that Defaulting Defendants have not responded to the evidence of counterfeit sales with evidence of their own, such as expenses incurred that might reduce the damages award. *See Sara Lee Corp. v. Bags of New York, Inc.*, 36 F. Supp. 2d 161, 168-69 (S.D.N.Y. 1999); *see also Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966, 973 (2d Cir. 1985). The purpose of statutory damages is to relieve the plaintiff whose marks are counterfeited from the burdensome requirement of proving its precise damages or a precise figure for lost profits. The trademark counterfeiter, particularly the counterfeiter who does not appear, is not entitled to a reduction on the assumption it sold the less expensive goods or an adjustment for expenses it has not proven. As a result, it is appropriate for a court to rely on the revenue lost by Plaintiffs, rather than the profits earned by Defaulting Defendants and further, to base that calculation on the assumption that Defaulting Defendants sold the highest grossing of the Plaintiffs' products. This Court does so by multiplying the number of sales of Counterfeit Products found by NAL for each of the six Defaulting Defendants by the sale price of the highest priced Bunchems Product (*i.e.*, $29.99). On an aggregate basis, the six Defaulting Defendants sold 50,893 Counterfeit products for a total of $1,526,281.07.

The Court does not base its calculation of lost revenues on sales other than through Wish. Although Plaintiffs aver that "it is extremely likely that the number of sales of Counterfeit Products made by Defaulting Defendants greatly exceeds the number identified in ContextLogic's discovery responses," Scully Aff. ¶ 33, the truth of that allegation is merely speculative as to each Defaulting Defendant—let alone to all of them.  Plaintiffs have not provided evidence or made a well-pleaded allegation that any of the six Defaulting Defendants (or any other defendant for that matter) made even a single sale or marketed a single Counterfeit Product through a platform other than Wish.[7]  It is appropriate on a motion for a default judgment to hold Defaulting Defendants liable for statutory damages for acts of infringement they are alleged to have committed.  It is not appropriate to base an award of statutory damages on acts they might have committed but are not alleged to have committed.  *See Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc.*, 109 F.3d 105, 111 (2d Cir. 1997) (merely "accept[ing] [plaintiff]'s statement of the damages . . . did not satisfy the court's obligation to ensure that the damages were appropriate"); *see also Hood*, 2016 WL 1366920, at *15.

The third factor is the value of the trademark.  Courts can "infer from the well-known reputations of most or all of the trademarks and the sea of advertising that presses them on the consciousness of the buying public that they are indeed valuable."  *Polo Ralph Lauren v. 3M*

---

[7] Plaintiffs allege that the "Defaulting Defendants probably utilize other e-commerce platforms, such as eBay.com or Alibaba.com," but provide no evidence in support of that assertion.  Scully Aff. ¶ 32.  This conclusory allegation thus cannot be considered in this analysis unless Plaintiffs provide evidence on this point, whether through those e-commerce platforms or through Wish, which, Plaintiffs' counsel has represented to other courts, collects this information.  *See William Mark*, 2019 WL 4195365, at *4 (representing that "to sign up as a seller on Wish.com, a seller first must provide information regarding other online e-commerce platforms it utilizes in addition to Wish.com, such as AliExpress, Amazon and/or eBay").

*Trading Co.*, 1999 WL 33740332, at *6 (S.D.N.Y. Apr. 19, 1999).  Plaintiff alleges that the Bunchems Products have achieved great success since their introduction in 2015, winning best toy awards in 2015 and 2016.  Compl. ¶¶ 11-12.  On a motion for a default judgment, this Court is required to accept these factual allegations as true.  *Finkel*, 577 F.3d at 84.  The Court thus finds the marks and copyrights to be highly valuable.  *See, e.g.*, *Ideavillage Prod. Corp. v. Aarhus*, 2019 WL 2290514, at *7 (S.D.N.Y. May 7, 2019), *report and recommendation adopted*, 2019 WL 2287726 (S.D.N.Y. May 28, 2019); *Streamlight*, 2019 WL 6733022, at *13.

The fourth factor is the scale of defendants' infringement, though some courts in this District have likened this factor to deterrence of parties other than the Defaulting Defendants.  *See, e.g.*, *Gucci Am.*, 315 F. Supp. 2d at 520; *Bumble & Bumble, LLC v. Pro's Choice Beauty Care, Inc.*, 2016 WL 658310, at *5 (S.D.N.Y. Feb. 17, 2016) ("The need to deter other counterfeiters is particularly compelling given the apparent extent of counterfeit activity.").  Online marketplaces like Wish provide a "virtually limitless number of customers" for the Counterfeit Products.  *Streamlight*, 2019 WL 6733022, at *13 (defendants' use of Amazon.com online platform supported finding of widescale infringement); *see Rolex Watch, U.S.A., Inc. v. Pharel*, 2011 WL 1131401, at *5 (E.D.N.Y. Mar. 11, 2011) (defendants' use of three websites, including after receipt of two cease-and-desist letters, counseled in favor of fourth factor).

Application of this factor to the six Defaulting Defendants presents the Court with challenges.  On an aggregate level, the six Defaulting Defendants sold 50,893 Counterfeit Products.  The figure is exponentially greater if sales for all of the Defaulting Defendants are considered, which would bring the total to 75,529 Counterfeit Products.  *See* Scully Aff., Ex. F.  But Plaintiffs candidly admitted at argument that they did not have any evidence that any of the Defaulting Defendants were related or that the sale of a Counterfeit Product by one defendant

could be ascribed to another defendant.  The documented sales of Counterfeit Products through

Wish by some of the six Defaulting Defendants was clearly extensive.  Self Montessori and

tiantianfashion sold 40,487 and 9,441 Counterfeit Products, respectively.  *Id.*  In other cases the

quantum of documented sales of Counterfeit Products is not as extensive.  For example,

jiangxinanchang527 and duozifengcail23 sold 73 and 13 Counterfeit Products, respectively.  *Id.*

In the end, though, those sales are hardly *de minimis*.  Thus, this factor weighs in Plaintiffs' favor

with respect to all of the six Defaulting Defendants but to a greater extent with some of the

defendants than with others.

The fifth factor is willfulness.  "An infringement is willful where the defendant had

knowledge or recklessly disregarded the possibility that its actions constituted infringement."

*Streamlight*, 2019 WL 6733022, at *13.  "[C]ourts in [this Circuit] have concluded that use of

marks that are 'virtually identical' to the registered marks renders 'inescapable' the conclusion

that the defendant's infringement and counterfeiting was intentional."  *WooWee Grp.*, 2019 WL

1375470, at *10.  As discussed *supra* at 20-23, the Counterfeit Products are virtually identical to

the Bunchems Marks.  This factor weighs heavily in Plaintiffs' favor with respect to each of the

six Defaulting Defendants.

The sixth factor measures the degree of cooperation by the defendants.  This factor has

been described in different ways in the case law.  Some courts look to whether the defendant has

engaged in an "[a]ctive effort to mislead the court about continued willful counterfeiting," which

"is a traditional aggravating factor in statutory damages."  *Sara Lee*, 36 F. Supp. 2d at 168.

Other courts, however, have "construe[d] this element against defendants who fail to answer or

appear, thus preventing the exchange of comprehensive discovery."  *Streamlight*, 2019 WL

6733022, at *14.  The Court concludes that it is more appropriate to look to whether the

defendant has engaged in an effort to conceal the fact or scale of its wrongdoing or to mislead the plaintiff or the court about the existence or scale of counterfeiting. If a defendant has the right to default, with the only consequence being that it has lost the ability to defend itself against the well-pleaded allegations of a complaint, *see supra* at 17-18, it should follow that the mere fact of a default should not increase the quantum of statutory damages. Plaintiffs have not satisfied their burden with respect to this factor. The Court can imagine a circumstance where a defendant's act of concealment, including through the use of a platform that permits it to act anonymously and without providing contact information, would satisfy this factor. But Plaintiffs here have not argued that the Defaulting Defendants took active steps to conceal their identities or to avoid detection nor have they presented evidence (including in the form of an expert affidavit) that would support that conclusion. On the record here, and without prejudging how the Court would come out if different arguments and facts were presented, the Court cannot find for Plaintiffs on this factor.

The seventh and final factor is the potential for deterring the Defaulting Defendants. Although the Court recognizes that this factor is intended to "send a signal to these defendants" and impose a punitive component, there is law that "the need for high statutory damages as a specific deterrent is less pressing" when the Court is simultaneously granting a permanent injunction. *Streamlight*, 2019 WL 6733022, at *14; *see also WowWee Grp.*, 2019 WL 1375470, at *10.

The Court concludes that it is appropriate to award an amount of statutory damages against each of the six Defaulting Defendants calculated in reference to the damages that would be available against each upon a finding of willful infringement under Section 1117(c)(2) of the Lanham Act. Congress determined that a plaintiff who proved that the defendant intentionally

used a mark knowing that it was a counterfeit mark was entitled to receive three times the amount of its profits or damages, whichever was greater, along with a reasonable attorney's fee. *See* 15 U.S.C. § 1117(b).  When Congress added Section 1117(c) providing for statutory damages and then increased the amount of statutory damages that would be available, it presumably did not intend to supplant Section 1117(b) entirely.  There would be some cases of intentional counterfeiting where the Section 1117(b) remedy would provide a greater return, and others where the Section 1117(c) remedy would provide a greater return.  *See, e.g., Gucci Am.*, 315 F. Supp. 2d at 522 ("[I]t is an 'unadventurous corollary' to . . . treble any determinable damages when awarding statutory damages because '[s]tatutory damages give even greater weight to the need to deter and punish.'") (quoting *Sara Lee*, 36 F. Supp. 3d at 170).

On the facts here, an award of statutory damages against each of the six Defaulting Defendants equal to three times the amount of lost revenues based on the most expensive Counterfeit Products is appropriate.  Each of the six Defaulting Defendants engaged in willful and widespread counterfeiting and infringement of a valuable Bunchems Mark through sales on Wish.  An award of treble damages based on revenues recognizes that Plaintiffs' estimate was based on incomplete discovery due to default, and it resolves factual uncertainties against the Defaulting Defendants, such as which costs should be deducted from revenues.  Moreover, the Court takes into account the differences in the scale of the infringement by each of the six Defaulting Defendants by rounding up for those defendants who sold more than 100 Counterfeit Products.  To award Plaintiffs much more would provide Plaintiffs with a windfall.  *See, e.g.*, *Sara Lee*, 36 F. Supp. 2d at 170 (awarding three times the amount of defendant's profits in statutory damages); *Streamlight*, 2019 WL 6733022, at *15 (awarding same).

The damages are thus calculated as $29.99—the highest-priced Counterfeit Product—multiplied by the number of Counterfeit Products sold by each Defaulting Defendant multiplied by three with adjustments for four of the Defaulting Defendants:

- Self Montessori:    $3,642,615.39 rounded up to $4 million
                      (40,487 Counterfeit Products; 2 infringing uses)

- tiantianfashion:    $849,406.77 rounded up to $1 million
                      (9,441 Counterfeit Products; 2 infringing uses)

- freelyshopping:     $57,850.71 rounded up to $70,000
                      (643 Counterfeit Products; 6 infringing uses)

- ywyoyo:             $21,232.92 rounded up to $30,000
                      (236 Counterfeit Products; 3 infringing uses)

- jiangxinanchang527: $6,567.81
                      (73 Counterfeit Products; 1 infringing use)

- duozifengcai123:    $1,258.68
                      (13 Counterfeit Products; 1 infringing use)

*See* Scully Aff., Ex. F.

## C.     Motion for a Permanent Injunction

When a plaintiff has succeeded on the merits, as Plaintiffs have here on the default judgment, the Court may enter a permanent injunction to prevent further violations of trademark infringement and counterfeiting if plaintiff has demonstrated: "(1) that it suffered an irreparable injury; (2) that remedies available at law are inadequate to compensate for that injury; (3) that the balance of hardships between the parties warrants a remedy in equity for the plaintiff; and (4) that the public interest would not be disserved." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *see* 15 U.S.C. § 1116. This standard applies in both copyright and trademark infringement actions. *See U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515,

539 (S.D.N.Y. 2011), *aff'd*, 511 F. App'x 81 (2d Cir. 2013) (trademark); *Salinger v. Coking*, 607

F.3d 68, 77-78 (2d Cir. 2010) (copyright).

      Plaintiffs have met all four factors for the six Defaulting Defendants.  First, "[i]rreparable

harm exists in a trademark case when the party seeking the injunction shows that it will lose

control over the reputation of its trademark . . . because loss of control over one's reputation is

neither calculable nor precisely compensable.'"  *Int'l Council of Shopping Ctrs, Inc. v. Glob.*

*Infotech LLC*, 2019 WL 2004096, at \*5 (S.D.N.Y. May 7, 2019) (quoting *U.S. Polo Ass'n*, 800

F. Supp. 2d at 540).  Plaintiffs have not only suffered lost revenues, but they also argue that they

have suffered irreparable harm to the goodwill and reputation associated with the Bunchems

Products given the likelihood of confusion between the Bunchems Products and Counterfeit

Products, which may be of inferior quality and packaging.  Dkt. No. 82 at 6; *see Int'l Council of*

*Shopping Ctrs*, 2019 WL 2004096, at \*5.  Second, a "plaintiff has no adequate remedy at law

where, absent an injunction, the defendant is likely to continue" its infringement.  *Pearson*

*Educ., Inc. v. Vergara*, 2010 WL 3744033, at \*4 (S.D.N.Y. Sept. 27, 2010) (citation omitted).

Here, there is a strong probability that, absent an injunction, Defaulting Defendants will continue

to infringe, as they have already sold Counterfeit Products and/or infringed the Bunchems

Marks, and have more available for sale in their Merchant Storefronts.  *See Lauratex Textile*

*Corp. v. Allton Knitting Mills Inc.*, 519 F. Supp. 730, 732 (S.D.N.Y. 1981).  And Wish does not

require sellers to list any contact information so that the Defaulting Defendants may avoid

detection and continue to sell the Counterfeit Products through Wish with anonymity.  *See* Dkt.

No 19 ¶ 14.  Monetary damages are also inadequate to compensate Plaintiffs for the reputational

harm they have suffered and may continue to suffer.  *See Warner Bros. Entm't Inc. v. RDR*

*Books*, 575 F. Supp. 2d 513, 553 (S.D.N.Y. 2008) ("In view of the irreparable harm that would

flow from Defendant's continuing infringement, including lost sales of Rowling's companion books and the injury to Rowling as a writer, Plaintiffs have shown that money damages alone are an insufficient remedy.").

Third, the balance of hardships favors Plaintiffs because, through their default, the Defaulting Defendants have not identified any hardships for the Court to consider—nor could they. "It is axiomatic that an infringer . . . cannot complain about the loss of ability to offer its infringing product." *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012) (citation omitted) (in context of preliminary injunction). Finally, a permanent injunction would serve the public interest because "the public has an interest . . . in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality." *N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 344 (S.D.N.Y. 2010).

However, while Plaintiff has demonstrated that a permanent injunction is warranted in this case, the language of the permanent injunction is far too broad in several respects.

### 1.    Persons Enjoined

Paragraph III(1) of the proposed permanent injunction would have had the Court enjoin the following persons: the "Defaulting Defendant, its respective officers, agents, servants, employees, successors and assigns and all persons acting in concert with or under the direction of Defaulting Defendants (regardless of whether located in the United States or abroad), who receive actual notice of this Order." Dkt. No. 83 ¶ III(1).

As Plaintiffs admitted at oral argument, that language is overbroad. Fed. R. Civ. P. 65(d)(2) authorizes the Court to enjoin "only" the following who receive actual notice of the injunction: "(A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B)." The Court will replace the proposed language with the language of Rule

65(d)(2) by eliminating "successors and assigns" and replacing "acting in concert" with "acting in active concert."  Plaintiffs have reasonably contended that persons who operate under the direction of a Defaulting Defendant and who have notice of the permanent injunction may be liable for acting in active concert or participation with that Defaulting Defendant.  If that is so, Plaintiffs have no need for the language.  The reference to persons "acting in active concert" does the work for them.  But, if they are wrong (an issue the Court need not prejudge now), then the Court would have enjoined a person over whom it has no power.  The Court will not do so.[8]

### 2.    Document Retention

Paragraph III(1)(F) asks the Court to enjoin the Defaulting Defendants from:

[S]ecreting, concealing, destroying, altering, selling off, transferring or otherwise disposing of and/or dealing with: (i) Counterfeit Products; (ii) any computer files, data, business records, documents or any other records or evidence relating to:

i. Defaulting Defendants' User Accounts and/or Merchant Storefronts;

ii. Defaulting Defendants' Assets; and

iii. the manufacture, importation, exportation, advertising, marketing, promotion, distribution, display, offering for sale and/or sale of Counterfeit Products by Defaulting Defendants and by its respective officers, employees, agents, servants and all persons in active concert or participation with any of them.

Dkt. No. 83 ¶ III(1)(F).

Both User Accounts and Merchant Storefronts are defined extraordinarily broadly to include websites and accounts that are not used and never have been used for the sale of Counterfeit Products.  "User Accounts" are defined as "[a]ny and all websites and any and all accounts with online marketplace platforms such as Wish, as well as any and all as yet *undiscovered accounts* with additional online marketplace platforms held by or associated with Defendants, their respective officers, employees, agents, servants and all persons in active

---

[8] Plaintiffs also concede that this language may be limited.  *See* Dkt. No. 88 at 6.

concert or participation with any of them." Dkt. No. 83 at ii (emphasis added). "Merchant Storefronts" are defined as "[a]ny and all User Accounts through which Defendants, their respective officers, employees, agents, servants and all persons in active concert or participation with any of them operate storefronts to manufacture, import, export, advertise, market, promote, distribute, display, offer for sale, sell and/or *otherwise deal in products, including Counterfeit Products*, which are held by or associated with Defendants, their respective officers, employees, agents, servants and all persons in active concert or participation with any of them." Dkt. No. 83 at ii-iii (emphasis added). "Assets" are also defined broadly as "[a]ny and all money, securities or other property or assets of Defendants (whether said assets are located in the U.S. or abroad)." Dkt. No. 83 at iii.

In other words, this section would have the Court enter a broad permanent injunction requiring Defaulting Defendants to retain all kinds of documents relating to their businesses regardless of any connection to the sale of Counterfeit Products.

The Court granted a similar injunction against document spoliation at the TRO and preliminary injunction stage. *See* Dkt. Nos. 5, 18. That was appropriate. When a party "destr[oys] or significant[ly] alter[s] evidence, or . . . fail[s] to preserve property for another's use as evidence in pending or reasonably foreseeable litigation," that is wrongful and constitutes spoliation. *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). At the TRO and preliminary injunction stage, it was not clear which User Accounts or Merchant Storefronts were used to sell Counterfeit Products as Plaintiffs had not yet had the opportunity to take discovery. Thus, where there is a risk that a party will destroy or alter evidence, courts have not hesitated to grant such relief, which protects the litigants and preserves the integrity of the action before it. *See, e.g.*, *WowWee Grp.*, No. 18-cv-0706 (S.D.N.Y.), Dkt. Nos. 11, 27; *Spin Master*

*Ltd v. Alan Yuan's Store*, No. 17-cv-7422 (S.D.N.Y.), Dkt. Nos. 19, 24; *U.S. Commodity Futures Trading Com'n v. Falco & Stevens, Inc.*, 2006 WL 1134171, at *3 (S.D.N.Y. Mar. 6, 2006); *see also Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998) (obligation to preserve evidence arises when a party has "notice that the evidence is relevant to litigation").

At this stage, however, as a result of the default judgment, there will be no pending or reasonably foreseeable litigation against the six Defaulting Defendants as to whom the Court has personal jurisdiction. The case will be closed. The judgment will constitute res judicata. And, if and when litigation does become reasonably foreseeable, those Defaulting Defendants may have an obligation to preserve evidence that is relevant to the litigation regardless of this Court's order. *See Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001). There is no need—or warrant—to order the six Defaulting Defendants to preserve documents that "may" be relevant to a litigation or that is relevant but to litigation that has ended and presumably will not recur. Thus, in the Court's judgment, it is not appropriate for the Court to broadly enjoin Defaulting Defendants to preserve all documents related to their User Accounts and/or Merchant Storefronts or their Assets, which may or may not be used in connection with infringing or other Counterfeit Products and whose activities are not illegal in and of themselves.

Depending on the jurisdiction and on the law that governs the defendants, a defendant may have an obligation to preserve records regarding its assets or business activities. *See, e.g.*, 15 U.S.C. § 78q(a) (requiring registered broker-dealers to make and keep records prescribed by the U.S. Securities and Exchange Commission). But, if the law does not require a document to be preserved, a person generally does not have the obligation to retain it. The proposed language thus would restrict defendants from engaging in lawful activity and would reach far beyond the specific legal violations alleged in the Complaint. *See Starter Corp. v. Converse, Inc.*, 170 F.3d

286, 299 (2d Cir. 1999) (an injunction should be "'narrowly tailored to fit specific legal violations' because the district court 'should not impose unnecessary burdens on lawful activity'") (quoting *Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994)).

The request in clause (iii), however, stands on a different foot in the Court's judgment. That clause provides for the preservation of documents relating to "the manufacture, importation, exportation, advertising, marketing, promotion, distribution, display, offering for sale and/or sale of Counterfeit Products by Defaulting Defendants and by its respective officers, employees, agents, servants and all persons in active concert or participation with any of them." The Court has the power to impose recordkeeping requirements ancillary to an injunction and to make injunctive relief effective. *See Gucci Am.*, 315 F. Supp. 2d at 523 (requiring infringer to purchase only through authorized dealers and "to maintain adequate records in that regard"). And, since this request is limited to records regarding *illegal* activity, an injunction will not restrain otherwise lawful activity.

### 3. Permanent Injunction Against Financial Institutions and Third Party Service Providers

Paragraphs III(3)-(4) asks for broad injunctive relief against "Financial Institutions" and "Third Party Service Providers." Financial Institutions are defined as:

> Any banks, financial institutions, credit card companies and payment processing agencies, such as ContextLogic, PayPal Inc. ("PayPal"), Payoneer Inc. ("Payoneer") and other companies or agencies that engage in the processing or transfer of money and/or real or personal property of Defendants.

Dkt. No. 83 at iii. Third Party Service Providers are defined as:

> Online marketplace platforms, including, without limitation, those owned and operated, directly or indirectly, by ContextLogic, such as Wish, as well as any and all as yet undiscovered online marketplace platforms and/or entities through which Defendants, their respective officers, employees, agents, servants and all persons in active concert or participation with any of them manufacture, import, export, advertise, market, promote, distribute, offer for sale, sell and/or otherwise deal in

Counterfeit Products which are hereinafter identified as a result of any order entered in this action, or otherwise.

Dkt. No. 83 at iii-iv.

Paragraph III(3) enjoins Financial Institutions and Third Party Service Providers from, among other things, (1) transferring, encumbering, or paying any of Defaulting Defendants' Frozen Assets (as defined *infra*) from or to Defaulting Defendants' Financial Accounts, (2) transferring or otherwise disposing of and/or dealing with any computer files, data, business records, documents or any other records or evidence relating to Defaulting Defendants' Frozen Assets and Defaulting Defendants' Financial Accounts, and (3) knowingly instructing, aiding or abetting any other person or business entity in engaging in any of the activities enjoined by the proposed permanent injunction.  Dkt. No. 83 ¶¶ III(3)(A)-(C).  The "Frozen Assets" are those that were frozen pursuant to the Court's TRO, which were "any money, securities or other property or assets of Defendants (whether said assets are located in the U.S. or abroad)."  Dkt. No. 18 ¶ I(A)(4); *see also* Dkt. No. 5 ¶ 1(g).  The "Financial Accounts" are defined as "any and all financial accounts associated with or utilized by any Defendant or any Defendant's User Accounts or Merchant Storefront(s) (whether said account is located in the U.S. or abroad)."  Dkt. No. 83 at iii.

In short, Plaintiffs would have the Court issue them a blank check to fill in with any online marketplace they discover that sells or deals with Counterfeit Products or, even more broadly and expansively, any financial institution that engages in the processing or transfer of money of a Defaulting Defendant, regardless of whether that money is tied to the Counterfeit Products.  This section must be stricken.

The Court lacks authority to, and will not, enjoin third parties, including financial institutions and third party service providers, who are not before the Court.  "A court ordinarily

does not have power to issue an order against a person who is not a party and over whom it has not acquired in personam jurisdiction."  11A Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure* § 2956 (3d ed. 2020) (hereinafter, "Wright and Miller").  Indeed, "holding a nonparty in contempt for engaging in enjoined conduct might be considered as a possible denial of due process."  *Id.*

Fed. R. Civ. P. 65(d)(2) carves out a limited and circumscribed exception to that general principle.  On the notion that a party cannot do indirectly through a privy what it is circumscribed from doing directly and that jurisdiction resides over privies, *see Hansberry v. Lee*, 311 U.S. 32, 38 (1940), Rule 65 permits the court to enjoin, in addition to the parties, their officers, agents, servants, employees, attorneys, and others in "active concert and participation" who have notice of the injunction.  *See* Wright and Miller § 2956 ("The limitations or exceptions on binding the various persons listed in Rule 65(d)(2) in their individual capacities is required by contemporary notions of due process; they are premised on the fact that a party's officers, agents, servants, employees, and attorneys have not had an opportunity to appear before the court in their individual capacities and present personal defenses to the granting of injunctive relief against them.").

"[A]ctive concert or participation' exists if the third party 'aided and abetted' the party subject to the injunction," which requires showing "that the non-party had actual knowledge of the judicial decree and violated it, and that the challenged action was taken for the benefit of, or to assist, a party subject to the decree."  *Arista Records, LLC v. Tkach*, 122 F. Supp. 3d 32, 36 (S.D.N.Y. 2015) (citation omitted).  Rule 65(d) is thus based on "the assumption that the named defendant is an adequate representative of the rights of those persons listed in the rule who are not in a derivative relationship with the defendant," Wright and Miller § 2956, and it "represents

'an exception to the general principle that a court cannot 'make a decree which will bind any one but a party,'" *Allstar Mktg. Grp. LLC v. 158*, 2019 WL 3936879, at *3 (S.D.N.Y. Aug. 20, 2019) (quoting *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832 (2d Cir. 1930) (L. Hand, J.)). The Rule is designed for a limited purpose: "to codify the common-law doctrine that defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although [those aider and abettors] were not parties to the original proceeding." *Doctor's Assocs., Inc. v. Reinert & Duree, P.C.*, 191 F.3d 297, 302-03 (2d Cir. 1999) (citation omitted). It is for that reason that the Court will enjoin only persons in active concert or participation with the Defaulting Defendants—whether they are financial institutions or third party service providers or not—from infringing Plaintiffs' Bunchems Marks and Bunchems Works.

In requesting the Court to enjoin every (or any) financial institution or third party service provider, Plaintiffs thus ask it to go where it is not permitted. The proposed permanent injunction seeks to bind financial institutions and third party service providers without any finding that they are in "active concert or participation" with the Defaulting Defendants. A "bank[] or financial institution[] … that engage[s] in the processing or transfer of money and/or real or personal property" of a Defaulting Defendant may or may not be an aider and abettor and thereby a privy of a Defaulting Defendant. Likewise, an "[o]nline marketplace platform[] … through which [a Defaulting Defendant or one of its privies] manufacture[s] … and/or … deal[s] in Counterfeit Products" may or may not be an aider and abettor or in active concert or participation with a Defaulting Defendant. It will depend on the facts. *See* Wright and Miller § 2956 ("[T]he best way to approach the question of 'privity' may be to analyze the facts of each

41

case").[9]  This Court cannot prejudge now—before knowing the facts—whether any particular financial institution or third party service provider is necessarily and by definition an aider and abettor.  *See Allstar Mktg. Grp*, 2019 WL 3936879, at *3 ("The Court cannot conclude that a third-party who merely holds the Defaulting Defendants' assets—which may be wholly unrelated to the counterfeiting at issue in this case—is by definition 'in active concert or participation' with the Defaulting Defendants"); *see also Nike, Inc. v. Wu*, 2020 WL 257475, at *19 (S.D.NY. Jan. 17, 2020) ("Courts in this district have repeatedly rejected the argument that a bank is 'in active concert and participation' when it provides routine banking activities to an enjoined party.").

Paragraphs III(3) and III(4) also go beyond the power of the Court in the activity they seek to enjoin.  Paragraph III(3) would prohibit Financial Institutions and Third Party Service Providers from transferring or paying any of the Defaulting Defendants' Frozen Assets without further order of the Court.  Dkt. No. 83 ¶¶ III(3)(A)-(C).  Paragraph III(4) would enjoin Third Party Service Providers from, in any way, (1) providing services to the User Accounts or Merchant Storefronts of the Defaulting Defendants, and (2) knowingly instructing, aiding or abetting any other person or business entity in engaging in any of the activities enjoined by the proposed permanent injunction.  Dkt. No. 83 ¶¶ III(4)(A)-(B).

Regarding Paragraph III(3), as laid out below, *infra* at 46, now that Plaintiffs have a judgment against the six Defaulting Defendants, state law governs enforcement of and execution on that judgment.  There may be competing parties who have equal or superior rights to the

---

[9] In addition, Plaintiffs have not identified the third parties to be enjoined, instead referring to "[a]ny banks, financial institutions, credit card companies and payment processing agencies" and "[o]nline marketplace platforms . . . without limitation."  Dkt. No. 83 at iii.  "Rule 65 cannot be used to . . . bind non-parties whose identities and relationships to the Defaulting Defendants are largely unknown and unascertainable."  *Allstar Mktg. Grp.*, 2019 WL 3936879, at *3.

assets in defendants' accounts.  The Court will no longer supervise withdrawal from those accounts.

As to Paragraph III(4), it is, in effect, a shut-down order.  As drafted, it would prevent third party service providers from offering any and all services to User Accounts associated with the Defaulting Defendants—even those that have not been associated with the Counterfeit Products—and to Merchant Storefronts that may have been used to advertise or sell Counterfeit Products in the past, regardless of how many legitimate goods these User Accounts or Merchant Storefronts sold or currently sell and regardless of whatever the particular defendant might want to sell in the future.  This prohibition violates the fundamental principle that "[i]njunctive relief should be narrowly tailored to fit specific legal violations" and that "an injunction should not impose unnecessary burdens on lawful activity."  *Waldman*, 43 F.3d at 785; *see also Mickalis Pawn Shop*, 645 F.3d at 145 ("An injunction is overbroad when it seeks to restrain the defendants from engaging in legal conduct, or from engaging in illegal conduct that was not fairly the subject of litigation.").  Even though a "party who has once infringed a trademark may be required to suffer a position less advantageous than that of an innocent party," the injunction "must nonetheless be narrowly tailored to fit specific legal violations."  *Victorinox AG v. B&F Sys., Inc.*, 709 F. App'x 44, 51 (2d Cir. 2017) (internal quotation marks and citations omitted).

This Court would not have the authority to enjoin a merchant who operated a physical store from obtaining any financing or third party services on a showing that such merchant had in the past infringed a trademark or copyright or sold counterfeit goods.  *See Gucci Am.*, 315 F. Supp. 2d at 523 ("[O]nly in the most unusual circumstances could such a categorical ban on the sale of genuine goods be considered 'narrowly tailored' to the violation.").  There is no sufficient justification for doing so for merchants who operate by virtual storefronts.

4.      **Continued Alternative Service as to Financial Institutions and Third Party Service Providers**

Section IV of the proposed permanent injunction asks the Court to deem effective and continue the alternative service by electronic means ordered in the TRO and preliminary injunction as to Defendants, Financial Institutions, and Third Party Service Providers "through the pendency of this action," Dkt. No. 83 ¶ IV(1), specifically through service "by other means not prohibited by international agreement as the court orders," Dkt. No. 18 ¶ IV (citing Fed. R. Civ. P. 4(f)(3)).

District courts have "sound discretion" on whether to allow alternative service under Rule 4(f)(3). *RSM Prod. Corp. v. Fridman*, 2007 WL 1515068, at *1 (S.D.N.Y. May 24, 2007). "Although not explicitly provided for in the Rule, district courts in this Circuit generally impose two additional threshold requirements before authorizing service under Rule 4(f)(3): (1) a showing that the plaintiff has reasonably attempted to effectuate service on the defendant, and (2) a showing that the circumstances are such that the court's intervention is necessary." *Devi v. Rajapaska*, 2012 WL 309605, at *1 (S.D.N.Y. Jan. 31, 2012); *see S.E.C. v. China Northeast Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 398 (S.D.N.Y. 2014) (same).

The Court permitted alternative service on Defendants of the Complaint, summons, and materials supporting Plaintiffs' motion for a temporary restraining order. *See* Dkt. No. 18 ¶¶ IV(A), (C). It did so on Plaintiffs' application that "third-party merchants on Wish, like Defendants, have been known to use aliases, false addresses and other incomplete identification information to shield their true identifies and there are, in fact, no physical addresses whatsoever associated with the majority of Defendants' User Accounts." Dkt. No. 12 at 46. As to Financial Institutions and Third Party Service Providers, Plaintiffs' application was limited to the cursory and summary request that the Court authorize them to serve the "Financial Institutions and/or

44

Third Party Service Providers with notice of the Court's order of the Application via electronic means prior to serving Defendants with enough time" for these entities to comply. *Id.* at 48.

Plaintiffs' one-paragraph request for this continued relief in the proposed permanent injunction is similarly cursory. Dkt. No. 83 at 6; *see also* Dkt. No. 88 at 6. And Plaintiffs have not made any showing that whatever circumstances with respect to the Financial Institutions or Third Party Service Providers that might have justified service via electronic means at that time still exist today. *See* Dkt. No. 88 at 6. There is no justification presented for not serving those entities as provided in the Federal Rules of Civil Procedure. Accordingly, this aspect of the proposed permanent injunction will be denied.

### 5.     Post-Judgment Asset Restraint and Transfer Order

Section VI of the proposed permanent injunction asks the Court to freeze the Defaulting Defendants' assets and transfer them to Plaintiffs as full satisfaction of the statutory damages awards within twenty (20) business days following the service of the Court's order. Dkt. No. 83 ¶ VI(1). To the extent that Defendants' Frozen Assets are less than the individual damages awards, the proposed permanent injunction would have them transferred as partial satisfaction and that the Court continue the attachment of each Frozen Asset until Plaintiffs have recovered the full payment. Dkt. No. 83 ¶¶ VI(1)-(2). Plaintiffs also ask that in the event Plaintiffs discover new assets belonging to the Defaulting Defendants, that Plaintiffs have the ongoing authority to serve the injunction on any financial institutions controlling those assets or accounts. Dkt. No. 83 ¶ VI(3). Plaintiffs invoke Fed. R. Civ. P 64 and 65, 15 U.S.C. § 1116(a), and this Court's inherent equitable powers as sources of authority for this proposed relief. Dkt. No. 83 ¶¶ VI(2)-(3). The Court concludes that it lacks the power to impose the post-judgment asset restraint and transfer for substantially the reasons marshalled by Judge Woods in *Allstar Marketing Group*, 2019 WL 3936879, at *3-4.

Fed. R. Civ. P. 69 and N.Y. C.P.L.R. § 5222 govern the enforcement of money judgments in federal court, including on federal claims. The language of those provisions is clear and mandatory. *See, e.g., Schiavone v. Fortune*, 477 U.S. 21, 30 (1986) (holding that courts will not "temper the plain meaning of the language" of a federal rule of civil procedure). With limited exceptions not applicable here,[10] those provisions establish a carefully designed regime that permits a plaintiff to execute on its judgment while also protecting the rights of third parties to the assets that may be used to satisfy that judgment. Fed. R. Civ. P. 69(a)(1) states: "The procedure on execution—and in proceedings supplementary to and in aid of judgments or execution—must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies." The applicable "procedure of the state where the court is located" is N.Y. C.P.L.R. § 5222, which permits a judgment creditor to serve a restraining notice on a person who holds property belonging to the judgment debtor in order to prevent that person from transferring the property. N.Y. C.P.L.R. § 5225 then authorizes the commencement of a

---

[10] The last clause of Fed. R. Civ. P. 69(a)(1) says that a "federal statute governs to the extent it applies." It is addresses "specific federal statutes expressly governing execution preempt state statutes that specifically deal with execution procedure." 13 Moore's Federal Practice, § 69.03[2] (3d ed. 2020). Congress knows how to draft a statute to govern execution on or enforcement of a judgment when it wants to do so. It has done so in several federal statutes that refer to execution, including the Consumer Credit Protection Act, the Foreign Sovereign Immunities Act, and statutes relating to "execution and judicial sales" and execution in favor of the United States. *See* Wright and Miller § 3012. The Lanham Act is not one of those statutes. Nor is the Copyright Act. Under 15 U.S.C. § 1116(a), the Lanham Act permits a court to grant an injunction to prevent further infringement by Defendants, and such relief must be "narrowly tailored to fit specific legal violations" and "not impose unnecessary burdens on lawful activity." *Allstar Mktg. Grp.*, 2019 WL 3936879, at *3. It does not deal with execution after a judgment is entered. The Copyright Act's similar provision under 17 U.S.C. § 502(a) authorizing injunctive relief "to prevent or restrain infringement of a copyright" likewise does not address enforcement of a monetary judgment. The fact that Congress did not draft the Lanham Act or Copyright Act to supplant the rule in the Federal Rules of Civil Procedure for enforcement of judgments demonstrates that it did not intend a judgment under those statutes to be excepted from the Federal Rules.

special proceeding or motion practice against the person in possession of that property that may ultimately result in the transfer of the property after finding personal jurisdiction over the garnishee and a hearing.  Fed. R. Civ. P. 69 does not provide exceptions except as those are legislated by Congress.  *Cf. Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 834 (1988) ("Federal Rule of Civil Procedure 69(a) . . . defers to state law to provide methods for collecting judgments.").

Together, and importantly, these provisions require that notice and an opportunity to be heard be given to third parties in possession of, or who may be entitled to, those assets before transfer.  Thus, under N.Y. C.P.L.R. § 5222, were the Plaintiffs to seek to execute on a bank account where a Defaulting Defendant's assets were held, they would have to give notice to all persons who have competing, and perhaps superior, interests in those assets.

Plaintiffs' proposed relief violates the plain language of the Federal Rules and undermines that careful balance.  It would give Plaintiffs rights superior to those of other creditors that Congress did not intend them to have.  Under Plaintiffs' proposed permanent injunction, a financial institution holding an asset of a Defaulting Defendant necessary to satisfy the judgment would have to transfer that asset to Plaintiffs upon the mere request of Plaintiffs. They would have to do so even if another third party had a superior claim to that asset.  They would have to do so without providing prior notice.  And they would have to do so on pain of contempt if they failed to comply.  *See Allstar Mktg. Grp.*, 2019 WL 3936879, at *4.

That result would run counter to the policy of N.Y. C.P.L.R. §§ 5222 and 5225, which protect the interest of third parties who may have superior rights to the assets, by effectively depriving third parties of their right to procedural relief.  In addition, Plaintiffs' request, in effect, would have the Court grant them a blank check and permit them to freeze unknown assets in

unknown accounts possessed by the Financial Institutions, which are broadly defined and yet to be determined. *See supra* at 41-42. But Sections 5222 and 5225 do not permit Plaintiffs to "brandish the Court's authority over unknown third-parties, the identities of whom are unknown to the Court and over whom the Court may not possess personal jurisdiction." *Allstar Mktg. Grp.*, 2019 WL 3936879, at *4; *see also WowWee Grp. Ltd. v. Meirly*, 2020 WL 70489, at *3 (S.D.N.Y. Jan. 7, 2020) (plaintiffs must identify the particular property as to which they seek a turnover).

Finally, Fed. R. Civ. P. 64 and 65 do not provide the Court with authority for the post-judgment asset restraint. Rule 64 permits a court to seize a person or property to secure satisfaction of a potential judgment "under the law of the state where the court is located" unless a federal statute governs. As above, no federal statute governs in this instance. Rule 65 governs injunctions and restraining orders against only certain persons who may be bound: parties, officers, agents, servants, employees, attorneys, and other persons who are active concert or participation with these groups. Fed. R. Civ. P. 65(d)(2). This Rule also does not provide Plaintiffs with the authority they seek. In order to effectuate a freeze and transfer of the Defaulting Defendants' assets, the Court would need to bind financial institutions holding those assets, and the Court has already declined to do so. *See supra* at 39. As a result, if Plaintiffs wish to enforce a monetary judgment, they "*must* do so in accordance with the procedures set forth by New York law, specifically C.P.L.R. Article 52." *Allstar Mktg. Grp.*, 2019 WL 3936879, at *2.

### 6.      Temporary Continuance of Asset Restraint

Paragraph V of the proposed permanent injunction forbids Defaulting Defendants from interfering with any property in which they have an interest, except as set forth in N.Y. C.P.L.R. §§ 5222(h)-(i) of the N.Y. C.P.L.R., for 30 days after the entry of the Court's order with respect

to the injunction.  Dkt. No. 83 ¶ V.  Plaintiffs include this provision in light of Fed. R. Civ. P. 62(a), which Plaintiffs claim prevents them from executing a default judgment and enforcing an award of damages until 30 days after the entry of the judgment.  *See* Dkt. No. 82 at 23-25. Consequently, Plaintiffs argue, this provision can create a 30-day window for Defaulting Defendants in which to transfer, dispose of, or otherwise hide assets that may be necessary to support the judgment.  Plaintiffs ask the Court to continue the asset restraint for 30 days.

The framers of the Federal Rules anticipated Plaintiffs' concern but came up with a different solution.  Prior to 2018, the Federal Rules imposed an automatic 14-day stay of the execution of a judgment.  In 2018, however, Rule 62(a) was amended to extend the stay to 30 days and to provide that "execution on a judgment and proceedings to enforce it are stayed for 30 days after its entry, *unless the court orders otherwise*."  Fed. R. Civ. P. 62(a) (emphasis added). In the words of the advisory committee, this amendment "expressly recognizes the court's authority to dissolve the automatic stay or supersede it by a court-ordered stay."  Fed. R. Civ. P. 62 advisory committee's note (2018).  And the amendment acknowledged that one "reason for dissolving the automatic stay may be a risk that the judgment debtor's assets will be dissipated." *Id.*; *see also Allstar Mktg. Grp., LLC*, 2019 WL 3936879, at *4 n.6.  As such, Rule 62(a) now renders moot the risk of the assets dissipating during a stay.  The Court here will relieve Plaintiffs of the 30-day stay.  Plaintiffs may execute on and enforce the judgment immediately.

**CONCLUSION**

For the reasons stated herein, the motion for a default judgment is:

GRANTED as to Defaulting Defendants Self Montessori, tiantianfashion, freely shopping, ywyoyo, jiangxinanchang527, and duozifengcai123 for trademark counterfeiting and trademark infringement under the Lanham Act; and

DENIED as to the remaining Defaulting Defendants, but recognizing that the Court previously found jurisdiction at an early stage of the proceedings, the dismissal is without prejudice and with leave for Plaintiffs to provide evidence sufficient to establish personal jurisdiction over the remaining Defaulting Defendants within 30 days of the entry of this Opinion & Order.

The motion for a permanent injunction is DENIED without prejudice in its current form

as to all of the Defaulting Defendants.  Plaintiffs may amend their proposed permanent

injunction in accordance with this Opinion & Order and submit it to this Court for review within

30 days of the entry of this Opinion & Order.

The Clerk of Court is respectfully directed to close Dkt. No. 80.

SO ORDERED.

Dated: May 28, 2020
       New York, New York                    _____
                                             LEWIS J. LIMAN
                                             United States District Judge